J4NKROJM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VANCE KNIFFIN, et al.,

                Plaintiffs,

        v.                              19 CV 678 (WHP)
                                        19 CV 990 (WHP)
                                        19 CV 2136 (WHP)
MICRON TECHNOLOGY, INC.,
et al.,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        April 23, 2019
                                        10:00 a.m.
Before:
                HON. WILLIAM H. PAULEY III,

                                        District Judge

                        APPEARANCES
LEVI & KORSINSKY LLP
        Attorneys for Movant Patel
BY:  MARK LEVINE

GLANCY PRONGAY & MURRAY LLP
        Attorneys for Movants Lius and Fish
BY:  KEVIN F. RUF

THE ROSEN LAW FIRM PA
        Attorney for Movant Ferraro
BY:  PHILLIP C. KIM

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
        Attorneys for Movant State of Rhode Island
BY:  SCOTT FOGLIETTA

SIMPSON THACHER & BARTLETT LLP
        Attorneys for Defendant Micron Technology
BY:  JONATHAN K. YOUNGWOOD
        JANET A. GOCHMAN

ALSO PRESENT:  Dhiru Patel

J4NKROJM

(Case called)

MR. LEVINE:  Good morning, your Honor.  Mark Levine, of Levi & Korsinsky LLP.  With me this morning is my colleague, Melissa Muller, whose application for the New York Bar is pending, and Dhiru Patel, who is one of the moving lead plaintiffs, who I'm representing today.  He came in here from California to be here.

THE COURT:  All right.  Good morning.

MR. KIM:  Good morning, your Honor.  Phillip Kim, Rosen Law Firm, for Ferraro movants.

MR. RUF:  Good morning, your Honor.  Kevin Ruf, from Glancy Prongay & Murray, for movants Novriyanto Lius and Tom Fish.

MR. FOGLIETTA:  Good morning, your Honor.  Scott Foglietta, from the law firm of Bernstein Litowitz Berger & Grossmann, on behalf of lead plaintiff/movant Employees Retirement System of Rhode Island.

MR. YOUNGWOOD:  Jonathan Youngwood, Simpson Thacher & Bartlett, for Defendant Micron Technology.

MS. GOCHMAN:  Janet Gochman, also from Simpson Thacher & Bartlett, for Micron Technology.

THE COURT:  Good morning to all of you.

This is oral argument on the various motions for the appointment of lead plaintiff and lead counsel.  Clearly, all the parties agree that consolidation of these cases, in any

J4NKROJM

event, is appropriate in this case.

So with that, I'm prepared to hear from the various plaintiffs groups, in any or no particular order. So who wants to be heard?

MR. KIM: I'll go.

Good morning, your Honor. Phillip Kim, representing the Ferraro movants.

I think these motions present largely two issues. I think the first issue is, which of the movants have the largest financial interest under the statute? My clients, the related group, Mr. Ferraro and his family foundation, charitable foundation, purchased over 167,000 net shares and lost $1.3 million. And, as we noted in our opening briefs -- in our opening brief, actually, we cited some cases -- a court will consider the approximate losses and also net shares purchased, and there are courts that considered both of those factors.

We have advocated in our papers that, given that there is a single disclosure in this case, at the end of the class period, there's one drop. Ordinarily, when you have a long class period, you might have multiple corrective disclosures, and, in this case, you had one disclosure at the end. And we are advocating the position that, in that instance, net shares purchased is a factor that carries more weight than it ordinarily would in the ordinary case where you might have multiple partial corrective disclosures where --

J4NKROJM

THE COURT:  But in your opening brief, you advocated for the Court to look at the highest losses, and you only changed your theory in your opposition and reply briefs.

MR. KIM:  We advocated both, your Honor.  We said courts look to losses, but they also look at net shares purchased.  So this isn't a situation where we put our heads in the sand and said net loss and then we saw everyone make their motions and all of a sudden we create this new idea, new factor that the Court would look at.

But I think the reason why I start with this issue first is because I think the second issue, these unrelated movants, I think they get knocked out of the box.  So, under either of these analyses, if the Court were to accept we have the highest number of net shares, which I think is important -- in our reply, we provided a line graph of the volatility of Micron stock, and during that period, during the class period, the stock was in the thirties and up to the sixties, and at the end of the class period, it was a 7 percent drop, a couple dollars.

So, if you were to just look at the financial loss without taking into consideration the net shares, or even shares that are sold prior to the disclosure of the corrective information, the in-and-out losses, so to speak -- which, I think, by looking at all the briefing, everyone agrees should not be counted -- you have a situation where people have

overstated their losses.  And I think, in this situation, net shares purchased is an important factor that the Court should give due weight to.

THE COURT:  But do you have any authority from this circuit -- that is, from the Second Circuit -- for the proposition that one looks to net shares as most indicative of financial interest?

MR. KIM:  I do not, your Honor.  Of course, I've cited cases from California and other courts that have looked to net shares.  I think the cases we do cite, if you look at Lax-Olsten -- I think Olsten is an Eastern District case -- net shares purchased is one of the factors, and net funds expended, are one of the four factors a court will look at in determining a financial interest.

So I think, given those factors, here, it's just a factor that the Court should provide more weight to than it ordinarily would, say, in a case with multiple corrective disclosures in a class period.  In that instance, the net shares purchased at the end of the class period isn't so probative as to the number of shares that may receive compensation.

THE COURT:  You contend that any Dura adjusted LIFO losses should take account of gains.  Do you have any actual legal authorities supporting that specific approach?

MR. KIM:  I think the cases that we cited, and the way

that everyone had calculated it -- in fact, I think Mr. Patel's group provides LIFO losses in that manner. If you look at their loss chart that they initially submitted with their opening papers, for each of the accounts, they have fields for Dura/LIFO losses. And for some of the accounts, the Dura/LIFO losses are higher than the regular LIFO losses -- they call it straight LIFO -- and in some of the accounts, I think the ones that are sort of most probative -- you had one account that claimed about a $500,000 loss; when adjusted for Dura/LIFO, it went down to 16,000.

So I believe that's the analysis they conduct, and I think the way we've been doing LIFO -- you net out all the transactions because the whole purpose of LIFO is to take into account class period sales that may have been made when the stock price was artificially inflated. That's why courts prefer to use LIFO rather than FIFO, because LIFO will take into account where, when someone makes class period sales, they may, quote, benefit from the fraud, so to speak, because they're selling shares at artificially inflated levels before the corrective disclosure.

THE COURT: Do you have any numbers or calculations that are different in response to the LIFO calculations in the Lius and Fish figures?

MR. KIM: Yes. In our reply, just adding up Patel's numbers, because he's the largest person in their group with

J4NKROJM

the losses, if you just add up their own LIFO numbers, the number that we set forth is about 940,000, which we set forth in our papers.  I believe that the Lius and Fish group did their own analysis -- and they had a similar loss figure for Mr. Patel as well -- and looking at their figures, the chart they have in their reply, applying the Dura losses, I don't dispute the figures that they have.

So, in those figures, it did appears, if the Court were to consider each of these movants individually, that Mr. Fish would have the largest LIFO/Dura losses -- I think it's north of 2 million -- second would be my client, who has about 1.3 million, because my client didn't sell, so their Dura/LIFO or FIFO losses are all the same, but we do have the greater number of net shares.

THE COURT:  How did you arrive at that figure in your reply papers?

MR. KIM:  The $940,000 number?  We added all of the Dura/LIFO losses from Mr. Patel's loss chart.  If you look at his loss chart -- I believe it's document No. 30-2 -- in his loss chart, he sets forth the Dura/LIFO losses for his common stock purchases.  We didn't calculate it for his options purchases because, as we noted, a lot of his options transactions, I think the bulk of them, had either options contracts that he sold prior to the loan corrective disclosure, which are in and out, or were options contracts that expired

before the truth came out.  And I think even the Lius group has acknowledged that to do a prior Dura analysis, you wouldn't include those.  And I think that adjusted Mr. Lius' loss down to a very much smaller amount.  So that's the first issue, your Honor.

And I think the second issue is the idea of whether or not the Court should consider these unrelated groups.  The way I see it is:  They're fighting about who got the better declaration, who had a telephone call; I think these are all things that, if you're representing any client, you need to do, right, keep them informed, anything else.

I think, though, what's fatal about some of these applications, particularly the Patel application, because they explicitly ask the Court to consider him individually, is that the Court should not allow the movants to have it both ways. They can't come to the Court and say -- I think, in the opening declaration, the Patel group's declaration, it says something to the effect of, we agreed to work together as a group because we believe together we could maximize the recovery.  I'm paraphrasing; I didn't memorize it.

Then, in their second declaration, they say something like:  Well, if the Court doesn't want to consider the group, you should consider Mr. Patel because we still think he's in the best interests of the Court.

THE COURT:  Haven't courts in this district allowed

J4NKROJM

plaintiffs to make those arguments, to have it both ways?

MR. KIM:  They have.  And I'm not going to pretend that there are decisions from this court and others where judges have either just accepted the groups, have considered the group and said they've got the largest guy, what's the difference; and then there are judges that say, well, you guys came together as a group, it's not fair to everyone else, you know, everyone's got a moving target, these things need to be resolved quickly, you can't have a protracted practice where people are pointing fingers at each other saying, well, I had a phone call here, you had two phones calls.

So I'm not going to pretend those decisions don't exist.  I think the recent trend, however, is to reject the group in whole, particularly when you have members of the group kind of talking out of both sides of their mouth, saying, you know, we came together because we want to work together, it's going to benefit the class, oh, but, by the way, we read some of these arguments and now we want our single largest individual to be appointed, who, by the way, doesn't even have the largest individual losses, he's third.

THE COURT:  What authorities support this recent trend?

MR. KIM:  We cited the Aphria decision, which was before Judge Daniels, that came out recently.  There's a decision out of New Jersey, Riot Blockchain, called Takata.

J4NKROJM

That case is interesting because it involved similar type arguments where we were arguing about which group was better, the Patel group's firm had put in two declarations similar to the declarations they put in here, and the judge said, well, you guys have all moved together as groups and I am going to consider you as groups and we're going to reject you.

There's another decision out of Houston which is recent -- these are all 2018/2019 decisions -- Applied Opto, which we cite in our papers.  Same things happened.  In fact, in that case, I represented a group that had the single largest individual, and the judge in Texas said, you know what, you guys came together as a group, this belated request to consider you individually, I'm just not going do it.

So I'm urging the Court here (a) to find that Mr. Ferraro and his charity have the largest individual financial interests; in fact, has the largest collective financial interests if you consider net shares, given the circumstances.  If the Court finds that the net share factor in this instance isn't enough to tip the scales for financial interest, we suggest the Court consider these groups but reject them because they moved together as a group and, all of a sudden, after they hear the arguments, they decide, well, the Court should consider the largest individual.

That's the sum of my points, your Honor, unless you have any questions.  I can certainly answer them.  Otherwise,

J4NKROJM

I'll sit down and give my colleagues their time.

THE COURT:  Thank you, Mr. Kim.

MR. KIM:  Thank you.

Mr. Levine?

MR. LEVINE:  Yes, your Honor.

Good morning, your Honor.  I'm here on behalf of what we label in our papers the Micron investor group, which consists of Mr. Patel -- who, as I've told you, has come in from California to be here today, and if your Honor has questions, he can answer them -- Cetin Kayaer and Alexandru Vintu.

They have a group, have moved, they have a largest LIFO losses, of $4.3 million.  We think, looking at the Lax factors, most of the courts follow these four factors, and, certainly, in the first factor, total number of shares purchased, that group leads, over a million shares purchased, far outweighs all the other groups.  It is true that the Ferraro -- Mr. Ferraro has more net shares purchased -- 167, a little bit more than the 136 by the Micron group.  The Micron group has expended more funds than all the other groups -- 8.6 million compared to 7.3 for Ferraro, who would be second; the Fish group 6.4, so we lead in that; and in terms of the LIFO claim losses, our group is over 4.3 million compared to 1.3 for Ferraro, and 5.2 for the Fish group.

THE COURT:  But in presenting your LIFO losses, you

J4NKROJM

don't make any Dura adjustment for securities that were sold before the corrective disclosure. Why not?

MR. LEVINE: Well, we don't think it was necessary. The cases we cite follow strictly LIFO analysis. Even a case that your Honor decided, in the Bank of America case, your Honor looked at the four factors and appears to have used the strict LIFO analysis and not adjusted for the ins and outs. So we thought that was an appropriate measure of losses for purposes of this motion.

THE COURT: But isn't the current trend to take account of Dura adjustments in calculating LIFO losses?

MR. LEVINE: Well, there certainly are cases that have come out the last few years that have made that adjustment, your Honor. We still think it would still be appropriate to follow the LIFO, strict LIFO analysis, especially in connection with the fact that our group purchased far more shares than any other group or individually.

And we think that the Fish group itself should be completely eliminated as a group because we think our group has demonstrated the necessary adequacy to be the lead plaintiff as a group. We've submitted two declarations indicating that the group has met on the phone, both before the motion was made, after the motion was made they reassembled to discuss the motion, they discussed after being aware of how the numbers were coming out and the attacks and whatnot, they had the

discussion in terms of what if the Court only allows -- is looking for one, what if the Court doesn't want to go for a group, because we know there are a number of cases where your Honor has not approved the group.

Well, we think the facts here are stronger than some of the -- most of the groups that your Honor has disallowed. And the group, as a whole, agreed that if your Honor did not approve the group as a whole, then Mr. Patel was more than willing to step up to the plate and be a lead plaintiff by himself. And he has very substantial purchases, over a million shares purchased, and $3 million of LIFO, LIFO losses.

The Fish group has shown really nothing in terms of their efforts to demonstrate that they're really active in this case. They didn't even file a declaration at the time of the motion. They belatedly filed one. And if you look at their declaration closely, they talk about a phone call they have, and you'll notice they don't even say that phone call was before the motion was filed. So it looks like, if they had one, it was kind of like a belated phone call as well.

And, as I say, the fact that Mr. Patel has come in from California to show that kind of interest, I think, speaks volumes for his participation.

THE COURT:  Do you have any case authorities for the proposition in your brief that the Court shouldn't consider the Lius/Fish declarations that came after the motion was filed?

J4NKROJM

MR. LEVINE:  I think we cited a paper in our reply brief -- it's not on my fingertips now -- that talked about, well, belated declaration.  I don't have it at my fingertips but I think it was in our brief, your Honor.

THE COURT:  Was there any preexisting relationship among the members of the Micron investor group?

MR. LEVINE:  No, they did not know one another.  They all contacted Levi & Korsinsky to get involved in this case.  And they agreed on the telephone call that they thought that this would be a good way to proceed, as a group, that they have 79 years of investing experience, you know, they have a lot of experience in this area, Mr. Patel is a retired engineer, so they have a lot of sophistication investing and they thought that would be a good group to work together.

They have indicated that they're going to stay very involved -- they've come to court appearances, if necessary, review documents, read motions and those types of things -- so they're very serious about this case.

And if you read their declarations, they're not just somebody who's going to be led around by their lawyers, that they're going to take a very active role and discuss carefully.  They've put together a plan, if there are disagreements in terms of strategy and whatnot.  As opposed to the Fish group, who just say, well, we'll figure it out, their group will certainly make every attempt to come to a consensus, but they

J4NKROJM

say in the declaration, if they can't, they will retain a federal state judge and --

THE COURT:  What's the plan that they have for this litigation?

MR. LEVINE:  The plan?  The plan is to move forward now.  I mean, if your Honor appoints our group and appoints us lead counsel, the first part of the plan is to do investigation and put together a good amended complaint that's going to sustain a motion to dismiss -- which I'm sure Micron will be moving to dismiss, as companies always do -- and get beyond that, have discovery, class certification.  That's the broad outline of the plan.

THE COURT:  Assuming this Court were to grant your application, how much time would you need to file a consolidated amended complaint?

MR. LEVINE:  I would think we can do it in about 45 days.

THE COURT:  All right.

MR. LEVINE:  I mean, there's a lot of investigation to do.  The complaints that were filed were not the most detailed complaints.  There's certainly a lot of smoke in those complaints, but, obviously, to sustain a motion to dismiss, we're going to need to do a lot of work, and we're prepared to do it.  And I know that this group will be consulting with us as their counsel on the way, and we'll be working together.

J4NKROJM

THE COURT:  Anything further, Mr. Levine?

MR. LEVINE:  Not unless your Honor has any questions.

THE COURT:  Thank you.

MR. RUF:  Good morning, your Honor.  Kevin Ruf, representing, again, Mr. Lius and Mr. Fish.

You've seen the papers and you've seen the loss charts that we prepared.  Our group has the largest losses under either of the LIFO, Lax-Olsten method or the, more recently utilized, Dura adjustment.  Mr. Fish also has the largest loss when there is a Dura adjustment.

THE COURT:  Did you exclude gains from your calculations after the Dura adjustments?

MR. RUF:  No.  You mean in respect to the argument that --

THE COURT:  The Ferraro group makes.

MR. RUF:  Yes, no, we don't believe that's an appropriate approach to this.  They're two discrete issues.  To us, it would be almost like saying investors who generally, during that year, made more money should somehow be disqualified or who had net gains over the course of all their investments should be disqualified or somehow that should be netted out against their losses.  They're totally separate issues.

The losses that are incurred as a result of the fraud has been a highly litigated and highly legislated question with

respect to how those damages are calculated, and there's never been a suggestion that the damages need to back out any gains that occurred in some prior time before the revelation of the fraud.

THE COURT:  So the gains are not accounted for in your Dura-adjusted calculations?

MR. RUF:  No, they are not.

THE COURT:  Do you know how accounting for those gains would affect your reported losses?

MR. RUF:  So, in other words, if the investor, during pre-revelation period, had a net gain, how that would have affected the Dura-adjusted losses?

THE COURT:  Yes.

MR. RUF:  No, I don't know the answer to that.

So, your Honor, I'm happy to answer questions.  I think we set forth the position in the brief.

Our group did not know each other before this litigation.  They both approached us -- well, what they certainly understood, and understand, the nature of being in a group and working together, and they had thought that was a good idea.  Particularly because Mr. Lius is primarily an options investor while Mr. Fish is a primarily an equity investor, they felt they were a good team with respect to claims that would represent all of the investors.

THE COURT:  Did they have any contact with each other

J4NKROJM

prior to the time your motion was filed?

MR. RUF:  My understanding is, yes, they did.

THE COURT:  What was the nature of that contact?

MR. RUF:  My understanding is through emails they were in touch with each other and with our firm.  There have been a number of emails exchanged.

THE COURT:  Have they before spoken?

MR. RUF:  They have.  They had at least one conference call in which all the issues in the case as well as the going-forward strategy et cetera was discussed.

THE COURT:  When was that?

MR. RUF:  I don't know when that was, your Honor.

THE COURT:  Was that before or after the motion was filed?

MR. RUF:  I believe it was after the motion was filed, but I'm not certain on that.  But I do believe, and understand, that it was very deliberate, in the declaration, that they had an understanding of their desire to be in a group, that they were aware of each other, that they had been in contact, but I don't believe they had been on the same phone call before the motion was filed.

THE COURT:  Right.  When you say in your motion papers that they were "aware of each other," I'm just wondering what that means.  I'm aware of many people that I've never had any contact with and never had a thought about ever working with,

J4NKROJM

so I just don't know what that phrase means.

MR. RUF:  I think it had substance, your Honor.  These individuals were in contact with our firm and then collectively in contact, in group emails, with respect to how things would progress, what was going on, what the schedule looked like, et cetera.

THE COURT:  How will the fact that the two plaintiffs are half a world away from each other affect their ability to work together and participate in this litigation?

MR. RUF:  My understanding is that that issue was discussed.  One is in Singapore, the other in Virginia, and the belief is that we would be able to -- as the conference call that was scheduled was able to be scheduled at a time when both would be available as well as communicating through emails, et cetera.

THE COURT:  All right.  Quite frankly, you can't get further away from New York than Singapore, right?

MR. RUF:  That's true.

THE COURT:  Do they have any specific plans on how to move forward?

MR. RUF:  Your Honor, similar to counsel's response, obviously, the focus right now would be on putting together the best possible complaint.  They're aware of the process that goes on, where almost invariably the defendant will seek to dismiss the case, and that that's a major event in the case.

J4NKROJM

Even now, we're continuing to do investigation and trying to gather additional evidence, and they understand that.  And both of them are aggressive investors, and they bring that same approach to their desires about this litigation, their wanting action.

THE COURT:  I'm going to put this question to Mr. Kim in a moment, but assuming the Court were to appoint your group and your firm in the case, how much time would you envision to file an amended consolidated complaint?

MR. RUF:  I thought 45 days seemed very reasonable.

THE COURT:  All right.

Anything further, Mr. Ruf?

MR. RUF:  No.  Thank you, your Honor.

THE COURT:  Thank you.

Mr. Kim, you've had a chance to contemplate that question:  How long, if your group were appointed, would you need to file an amended consolidated complaint?

MR. KIM:  Forty-five seems reasonable.  However, we're prepared to move faster.  I think we could to it in 30 days. This is a case, I forgot to mention, that involves a Chinese element, where Financial Times published an article about this conduct, the price-fixing with Samsung in China, the Chinese authorities.  Our firm was lead counsel in the Alibaba class action, we've worked over the past couple years with Mr. Youngwood's firm, defending that case, we've done

J4NKROJM

depositions in Hong Kong, we've been flying across the world to do depositions and to do discovery in China, which in and of itself is a very difficult task. So I think we could move faster and, certainly, we could do it more efficiently.

I think the other issue, after hearing the argument about the Patel group and their mechanism to resolve disputes, I thought that was a little strange, that if they would have a dispute, they would hire a mediator to resolve the dispute. And it kind of reminded me of a case that Judge Castel had issued. It's called Lightinabox. It was on a lead plaintiff dispute. And there, the Court rejected a group because of the idea that there's a lead plaintiff group and within their own group they have varying financial interests. Should Mr. Patel have more of a say than someone in his group who has half his losses, or should they have equal say? The whole point of the PSLRA is that the individual, the movant with the largest financial interest, should be driving the bus.

So I think, as these cases move on, we get into class certification, you know, we're still at the lead plaintiff stage, but at class certification, Mr. Youngwood's firm, they're going to come hard against these plaintiffs. And I think when you have these unique situations that could make some of these plaintiffs atypical, the regular class member is not going to have the benefit of a mediator to resolve any dispute if they don't agree with a certain strategy or --

J4NKROJM

THE COURT:  What about disaggregating, let's say, Mr. Patel from the Micron group as lead plaintiff, or Mr. Fish as lead plaintiff from the Lius Fish group?

MR. KIM:  Just looking at these submissions, of course, I don't want the Court to disaggregate.  I think, in this situation, they're unrelated groups, they came together as a group, they told the Court in sworn submissions, saying, we're better as a group, we're going to get a bigger recovery; and then, come opposition reply, they say, well, you know what, we talked amongst ourselves, we changed our mind, and, in fact, you can take Mr. Patel, he's got the largest loss within our group.

I think that's not fair.  I think that's why there's the recent trend in the Aphria decision and the Riot Blockchain decision.  In that decision, you had the same issues with the multiple declarations; people were quibbling about when did they have the phone call, was it before or after, did you submit your declaration before or after.  I think the recent trend is, the courts are streamlining the process, saying, hey, look, this is the hand that you played, right, this is what you're going in with; when they flip all the cards, you can't change your cards midway.

Thank you, your Honor.

THE COURT:  Mr. Foglietta, do you wish to be heard at all?

J4NKROJM

MR. FOGLIETTA:  Just briefly, your Honor.

Again, my name is Scott Foglietta, on behalf of Rhode Island.

As set forth in our papers, Rhode Island acknowledges it doesn't have the largest financial interest in these claims, although it does have the largest financial interest of any institutional investor seeking appointment of lead plaintiff in this case.  Nonetheless, should the Court find that these competing movants haven't substantiated their financial interests or are otherwise unsuitable to represent the class, Rhode Island serving as sort of a backstop there would be ready, willing and able to step in and serve as lead in this case, and has experience doing so in the past, and would be glad to do so again here.

Unless you have any questions --

THE COURT:  Thank you.

Mr. Youngwood, do defendants have anything they wish to add to this proceeding?

MR. YOUNGWOOD:  Your Honor, nothing on the motions before you.  Whoever is appointed will go through a class cert stage at some point, assuming the case gets past the motion to dismiss, and we can address our issues at that stage.

When you're done with this, I have a few housekeeping matters to raise, but nothing with respect to these motions.

THE COURT:  All right.

J4NKROJM

Anything further?

MR. LEVINE:  Your Honor?

THE COURT:  Sure, Mr. Levine.

MR. LEVINE:  Just I know the point has come out about whether one filed as a group, whether they live or die as a group, and, apparently, obviously, there were some cases where courts have found if you're a group, you're a group and you can't go individually.  I know there are many cases where courts have found that, if the Court doesn't like the group as a group, that if you have an individual who's qualified, got a large loss, that they're not bound by the group.

And, your Honor, in the Bank of America case, your Honor noted that, and ruled that way, and your Honor cited the Cardinal Health, SureBeam and Razorfish cases as examples where courts have rejected the group.  I'm not suggesting your Honor reject the group, but if your Honor did reject the group, it would still be appropriate to look at Mr. Patel as the largest financial loss within the group and within the whole movement.

So I think that's an option that's there if, for some reason, your Honor does not approve our group as a whole, although we think that we've met the burden -- with all the conference calls, the declarations, Mr. Patel being here, we think that goes far more than a lot of the cases where your Honor has rejected this idea.  So we don't think that they live or die as a group.

J4NKROJM

Thank you.

THE COURT:  Thank you.

Anyone else?

All right.  Then let's turn to the housekeeping issues, Mr. Youngwood.

MR. YOUNGWOOD:  Yes.  Two items, your Honor:

First, I think on the docket is a May 23rd initial conference.  My assumption is that was automatically generated and there's no need for that, given where we will be in the case.

THE COURT:  Right.  I anticipate deciding the motions that are before me in fairly short order.  And given the parties' general agreement that 45 days would be needed to prepare and file an amended consolidated complaint, I think it doesn't make any sense for us to have an initial pretrial conference or premotion conference until we all see what the consolidated pleading is.  So I will be adjourning that date.

MR. YOUNGWOOD:  Okay.  Thank you.

And then, your Honor, there is an existing stipulation in, I think, the first-filed case, the Kniffin case, that would give us 60 days to respond to that complaint.  If that's still acceptable, we'll use those 60 days.  If it's not, we could do it a little bit quicker, but having not seen it --

THE COURT:  Right, we'll discuss a schedule at the ineluctable premotion conference that you will be requesting in

J4NKROJM

this case.

MR. YOUNGWOOD:  The final item, your Honor, there is an associate at my firm Dean McGee, who I had planned to make an appearance in this case.  He's a former clerk of yours.  I didn't want to do that without disclosing it to the Court and counsel, and make sure there are no concerns with that.

THE COURT:  I can say that it won't affect my judgment in this case.

If any party feels differently about it, now that it's been disclosed, they should submit a letter to the Court within ten days about that.

All right?

MR. YOUNGWOOD:  Thank you, your Honor.

THE COURT:  Anything else?

MR. YOUNGWOOD:  Not from me.

THE COURT:  All right.

Thank you, all, for your presentations.  Decision on the motion for lead plaintiff and lead counsel reserved.  As I've said, I will, at the same time that I decide that motion, enter an order consolidating the proceedings and directing the filing of an amended consolidated complaint.

Have a good afternoon.

COUNSEL:  Thank you, your Honor.

*  *  *